164

In the Matter of the Application of ELMER G. LETERMAN, Petitioner, for a Certiorari Order against LOUIS H. PINK (GEORGE S. VAN SCHAICK), Superintendent of Insurance of the State of New York, Respondent.

In the Matter of the Application of HERBERT R. EBENSTEIN, Petitioner, for a Certiorari Order against LOUIS H. PINK (GEORGE S. VAN SCHAICK), Superintendent of Insurance of the State of New York, Respondent.

In the Matter of the Application of STEBBINS, LETERMAN & GATES, INC., Petitioner, for a Certiorari Order against LOUIS H. PINK (GEORGE S. VAN SCHAICK), Superintendent of Insurance of the State of New York, Respondent.

First Department, November 27, 1936.

*Frederick C. Tanner* of counsel [*Leonard M. Gardner* with him on the brief; *Tanner, Sillcocks & Friend,* attorneys], for the petitioner Elmer G. Leterman.

*Samuel R. Gerstein,* for the petitioners Herbert R. Ebenstein and Stebbins, Leterman & Gates, Inc.

*Paul R. Taylor, Special Assistant Attorney-General,* of counsel [*Henry Epstein, Solicitor-General,* with him on the brief; *John J. Bennett, Jr., Attorney-General*], for the respondent.

COHN, J. The petitioners Stebbins, Leterman & Gates, Inc., Elmer G. Leterman and Herbert R. Ebenstein each instituted separate certiorari proceedings to review and annul determinations

made by the Superintendent of Insurance dated October 29, 1935, amending *nunc pro tunc* earlier determinations dated December 28, 1933, which respectively revoked the licenses of each of these three petitioners to act as insurance brokers and denied their applications to act as insurance agents. The charge against Stebbins, Leterman & Gates, Inc. (hereinafter referred to as the corporation) was that it had been guilty of fraudulent or dishonest practices and had demonstrated its incompetency or untrustworthiness to transact business as an insurance broker or agent. As against Ebenstein and Leterman, it was charged that, as vice-presidents of the corporation, they were directly responsible for the improper acts of the corporation. The charges against the petitioners and those of like character filed against the two other directors of the corporation, were heard together.

After extended hearings, the Superintendent of Insurance, on December 28, 1933, found the charges sustained and accordingly revoked the licenses issued to the corporation as a public adjuster, under section 138-a of the Insurance Law, as a broker under section 143 of the said law, and denied the requests of certain insurance companies to have the corporation represent them under the same statute, for the reason that the corporation was guilty of dishonest practices and was untrustworthy, " in that it has failed to properly account for insurance premiums collected or received by it." Simultaneously, the Superintendent revoked licenses issued to Leterman under sections 91, 91-a and 143 of the Insurance Law, upon the ground that he, as a vice-president and director of the corporation, was " regarded as responsible for its irregularities," and, upon the same ground, the Superintendent revoked the licenses issued to Ebenstein, to act as agent under section 91 of the Insurance Law and denied his application for a license under section 143 of the Insurance Law.

At the request of the petitioners, the Superintendent, on August 9, 1935, granted a rehearing, it having been stipulated that such proceedings were to supplement the original hearings. Additional testimony was taken and after the completion of the supplemental examination, the Superintendent on October 30, 1935, amended his earlier finding as to the corporation " by striking out the   *   *   * conclusion that the corporation was guilty of dishonest practices and is untrustworthy within the contemplation of the Insurance Law and allowing the revocation to stand and continue on the premise that the corporation has demonstrated its incompetency to transact the business of an insurance broker, the business of a public adjuster of fire losses and the representation of insurance companies as an agent in this State, on the ground that it has failed to properly

account for insurance premiums collected or received by it." As to Leterman and Ebenstein, the Superintendent's amended finding was the same as his original one save that the language as to the guilt of the corporation for which they were held personally responsible was modified as indicated.

These are the three determinations now under review. The petitioners contend that the evidence adduced before the Superintendent of Insurance is insufficient to sustain his final determinations. The individual petitioners raise the further contention that, in support of his determination as to them, the Superintendent failed to find, as required by subdivision 11 of section 143 of the Insurance Law, that each was " personally at fault " in connection with the derelictions of the corporation of which they were officers.

In considering the claims of the petitioners, it becomes necessary to make brief reference to the salient facts.

Stebbins, Leterman & Gates, Inc., was organized in this State in 1928 for the purpose of engaging in the general insurance business; Arthur W. Stebbins, Albert N. Gates and Leterman, one of the petitioners herein, were its original stockholders, officers and directors. In August, 1930, Ebenstein effected a merger of the insurance business of H. R. Ebenstein & Co. with that of Stebbins, Leterman & Gates, Inc.; he then became a stockholder of the latter corporation, was made a vice-president and a member of its board of directors. These four, Stebbins, Gates, Leterman and Ebenstein, as officers and sole directors, managed and directed the affairs of the corporation from August, 1930, until October 3, 1932, when Leterman and Ebenstein retired, although Ebenstein returned at a later time. It appears that the corporation attracted a very large clientele and developed a prosperous insurance business. However, after August, 1930, the general business depression, coupled with a lack of harmony among these officers, caused a perceptible diminution of its income. The dwindling assets of the corporation were further depleted by reason of payment to these officers of large sums for salaries, expenses and overdrafts. The testimony is that in July, 1932, there was due from the corporation to insurance companies the sum of $300,000, and that, as of December 31, 1932, there was a deficit in the funds of the corporation of $239,685.93, that is, the current liabilities exceeded the current assets by that sum. It appears from the evidence, too, that premiums which had been collected from policyholders, prior to October 3, 1932, had not been transmitted by the corporation to the companies entitled to the moneys so collected. This condition of affairs precipitated an arrangement between the corporation and the insurance companies, evidenced by an agreement in writing executed on January 31,

1933, wherein provision was made by the corporation for a gradual payment of the moneys withheld from the insurance companies. The plight of the corporation is forcefully portrayed by the language of the opening recitals of this funding agreement, which was signed on behalf of the corporation by Arthur W. Stebbins as its president and L. D. Beechler, its treasurer. The introductory portion of the agreement reads as follows:

" WHEREAS, as a result of the present depression, overdrafts on the part of two of the officers of the said corporation and the use of premium funds in the payment of salaries and expenses over a period of the last two years, the corporation has reached a point of substantial insolvency and

" WHEREAS, there are large sums of money due to the Globe & Rutgers Fire Insurance Company, the National Liberty Insurance Company and the Home Indemnity Company on account of premiums collected prior to October 3, 1932,

" WHEREAS, there are substantial sums though in smaller amounts due to approximately twenty-five insurance companies on account of premiums collected prior to October 3, 1932, by Stebbins, Leterman & Gates, Inc."

These statements and others set forth in the document are a clear and frank admission of guilt by the corporation of the charge made against it.

Quite apart from the provisions of this agreement, the record itself is replete with evidence which establishes that insurance premiums collected and received by the corporation during the years 1930, 1931 and 1932 were thrown into its general funds and were diverted by paying the running expenses of the corporation, including large salaries to these officers.

The argument made by petitioners that it is a custom among insurance brokers to mingle premiums collected from clients with other moneys is without foundation. We find no evidence in the record that there is such a custom in the insurance business. Moreover, we are loath to believe that such custom does, in fact, exist. Premiums due on a policy of insurance and paid to an insurance broker for transmission to an insurance company when received by the broker, become trust funds. In the faithful discharge of his duty to his client, it is the obligation of the broker not to intermingle such moneys with his general funds. The clear duty of any insurance agent is to keep separate and distinct, from his own property, specific premium payments received from a client and promptly to transmit to the insurance companies moneys thus collected.

The evidence fully sustained the Superintendent's charge of incompetency against the corporation and his act in revoking its license was eminently proper.

As to petitioners Leterman and Ebenstein, the admissions contained in the agreement heretofore referred to, are, of course, in no way binding upon them for neither of these two men was a party to the agreement, nor was either connected with the corporation at the time the agreement had been made. Nevertheless, an examination of the evidence taken before the Superintendent justifies his finding that these petitioners as officers of the corporation were responsible for the corporation's demonstrated incompetency for failure to properly account for premiums collected. Leterman and Ebenstein were not only active officers, but were also directors of the corporation during the entire period from August, 1930, to October 3, 1932. As such, they were responsible for the breaches of trust and other wrongful acts committed by the corporation which the Superintendent has justly condemned. A director is chargeable with knowledge of the general condition, progress and financial situation of a corporation. He is presumed to know everything concerning corporate affairs that he might have learned by the exercise of reasonable care and diligence. In *People ex rel. Leach* v. *Central Fish Co.* (117 App. Div. 77) this court had occasion to say (p. 79): " The duty of a director is to direct, and if he neglect this duty he is certainly guilty of a moral wrong, if not a legal one. To perform this duty intelligently it is essential that he should keep himself informed as to the business and affairs of the corporation and as to the acts of its executive officers, and in order to keep himself so informed he has the unqualified right to inspect its books, records and documents. All that he need show to entitle himself to an inspection is that he is a director of the company; that he has demanded permission to examine and that his demand had been refused. (*People ex rel. McInnes* v. *Columbia Bag Co.*, 103 App. Div. 208; *People ex rel. Gunst* v. *Goldstein*, 37 id. 550.) "

Moreover, the record itself reveals that the petitioners had full knowledge of the conditions existing in the corporation during the time they were directors; they were aware that it had failed to account properly for insurance premiums collected or received. In March, 1931, at a meeting in Stebbins' home and again in June, 1931, and at a meeting of the board of directors in April, 1932, there were discussions concerning the financial conditions of the company among its four directors. On October 3, 1932, although the corporation was then heavily indebted to many insurance companies, the account of Leterman with the corporation was overdrawn to the extent of $33,000, and that of Ebenstein the sum of

$74,561.90, which sum later was corrected to $58,425.30. These overdrafts were not paid. In 1931 Leterman received a salary of $11,475 and was paid $7,500 on his expense account; for 1932 his salary was $11,325 and he had received for expenses $4,875. In 1931 Ebenstein drew a salary of $19,350 and $5,000 for expenses, and in 1932 a salary of $12,075 and expenses of $3,966.66. During all this time these moneys were being paid from the general funds of the company which included insurance premiums paid by clients; yet in July, 1932, there was due a total of about $300,000 to numerous insurance companies. Ebenstein himself testified that prior to October 2, 1932, the corporation carried only one bank account, depositing therein funds from all sources and withdrawing funds therefrom for all type of payments. Premiums collected, he admitted, were mingled with funds belonging to the corporation. Testimony to this effect was given by numerous other witnesses. In December, 1930, Ebenstein borrowed from the corporation the sum of $31,000 to pay a premium on the so-called R. K. O. account which was due to an insurance company although he had previously received payment for such premium from his client.

These are some of the important facts developed at the hearings upon which the Superintendent of Insurance found that the individual petitioners as officers of the corporation were responsible for its irregularities. He could scarcely have made any other finding.

There is no merit to the contention of the individual petitioners that in revoking their certificates of authority, the Superintendent has disregarded the mandate of the statute (Insurance Law, § 143, subd. 11), which requires that he must first determine that they were " personally at fault " in the matter on account of which the certificates of the corporation of which they were officers was revoked. The notice of the charges to each of the individual petitioners and the language of the original and amended determinations, plainly show that there was a finding by the Superintendent that the petitioners were personally at fault in the matter upon which the certificate of the corporation was revoked. The statute, as we read it, does not require that the Superintendent of Insurance use these precise words in a *pro forma* finding in reaching his determination.

A review of this voluminous record convinces us that the Superintendent of Insurance exercised great patience in the conduct of the protracted hearings and that he was amply warranted in concluding that the petitioners failed properly to account to insurance companies for premiums collected, and that all were clearly shown to be incompetent to act as insurance agents or brokers.

The orders of certiorari should be dismissed, and the determinations of the Superintendent of Insurance confirmed in all respects, with fifty dollars costs and disbursements to the respondent.

MARTIN, P. J., MCAVOY, UNTERMYER and DORE, JJ., concur.

Orders of certiorari unanimously dismissed, and determinations of the respondent confirmed, with fifty dollars costs and disbursements to the respondent.