[Civ. No. 15318.   First Dist., Div. One.   Jan. 8, 1953.]

JOHN R. MALONEY, as Insurance Commissioner, Plaintiff and Respondent, v. RHODE ISLAND INSURANCE COMPANY (a Corporation), Defendant and Respondent; MILLER, KUHRTS & COX, Appellants.

Hindman & Davis and Eugene Davis for Appellants.

Edmund G. Brown, Attorney General, T. A. Westphal, Jr. and Harold B. Haas, Deputy Attorneys General, for Respondents.

PETERS, P. J.—Respondent is the Insurance Commissioner of California, and conservator of the Rhode Island Insurance Company, a company whose assets have been taken over by and vested in the commissioner because of the possible insolvency and hazardous condition of that company in this state. Appellants are Miller, Kuhrts and Cox, a copartnership engaged in business as an insurance broker. The broker secured a policy of insurance from Rhode Island for one of its clients, the Southern California Edison Company, delivered the policy to the Edison company, and had in its possession the full premium for that policy. The assured directed the broker to cancel the policy, to pay over to the commissioner the earned premium, and to return to it the balance of the premium. The commissioner contended that the broker held such premium as agent for him as conservator, and demanded that the entire premium be paid over to him. The broker paid the unearned premium to the Edison company. Pursuant to an order to show cause instituted by the commissioner the broker was ordered to pay the amount of the premium, less commission, to the commissioner. The broker appeals, urging that, while the premium was in its possession, it was agent for the assured, and was at no time and for no purpose agent for the insurer. It is

also contended that the trial court lacked jurisdiction to enter the judgment appealed from. Neither contention is sound.

The evidence in this case consists primarily of two depositions, one of T. F. Burke, an employee of the Edison company and in charge of securing insurance for it, and the other of O. L. Cox, a member of appellants' firm. These two men conducted the transaction here involved. Except for a few minor points, there is no conflict in their testimony.

The record shows that appellants, as broker, had been handling the major fire and earthquake insurance for the Edison company since 1943. The broker secured such coverage from various insurance companies on behalf of the Edison company, without consultation with that company as to the selection of insurers. On February 27, 1949, all of the existing fire and earthquake insurance of the Edison company was to expire, and it was the function of appellants to procure the renewal of this coverage. Several months before the expiration date appellants began negotiations for renewals with many companies, a job made particularly difficult not only because of the size of the risk, but because many insurance companies were reluctant or unwilling to write earthquake coverage. By February 27, 1949, however, appellants had secured "binders" from various insurance companies, one of which was from Rhode Island, fully covering the risks involved. These "binders" are brief memoranda of insurance effecting coverage for a 60-day period, it being contemplated that formal policies would be issued during that period.

About the middle of April, 1949, Burke first directly learned that Rhode Island was one of the companies on the risk, and also learned from Cox that Rhode Island was having some difficulty with the state insurance department. Burke told Cox that the Edison company did not want to keep the policy if Rhode Island was "in any serious trouble," and may have used language indicating a desire to cancel the Rhode Island policy. Both the witnesses agreed that cancellation was then ordered if the troubles of Rhode Island developed into anything serious, and Burke demanded that Cox make a full investigation and report. Cox sent Burke a letter dated May 2, 1949, stating how difficult it was to secure earthquake coverage, and generally describing the then condition of Rhode Island. Enclosed was a report from an insurance reporting service calling attention to and describing the then serious difficulties of Rhode Island. Cox promised to

keep abreast of the situation with an eye to the possible replacement of the policy.

Just before or just after this letter was sent, Cox and Burke had a second conversation about Rhode Island and Burke was informed of the serious condition of that company. Burke then ordered the policy cancelled, with the implied understanding that such cancellation was not to take place until coverage in another company was secured. This, in fact, took another month.

In the meantime, on April 24, 1949, Cox sent to Burke a series of policies, including that issued by Rhode Island, and an invoice for such policies. The Edison company in due course, on May 10, 1949, paid to appellants the full amount of this invoice, that is, $40,712.28, of which $2,380 was apportioned on the voucher attached to the draft to the Rhode Island policy. Appellants deposited the draft in their premium account, and either then or later the amount due Rhode Island was duly credited on the books of appellants as a premium received for the Rhode Island account.

Sometime around the middle of May, Burke, in conversation with Cox, learned that appellants had received the Rhode Island premium from his company. Burke specifically ordered Cox not to pay the premium to Rhode Island and confirmed the order of cancellation previously given. Whether this conversation took place before or after Burke knew that respondent had been appointed conservator of Rhode Island is not clear from the testimony.

The order of conservatorship is dated May 17, 1949. It recited the facts in reference to the financial status of Rhode Island, vested title to all assets of the company in the Commissioner, appointed him conservator with authority to pay and defer claims, and enjoined the officers, employees, agents "and all other persons" from transacting Rhode Island business and the "disposition of any of its property or assets until the further order of this Court." The order likewise prohibited anyone from interfering with the conservator's title to the assets of the company or management of the business. The order specifically directed that any funds held by insurance agents or brokers "in their fiduciary capacities, as specified by section 1730 of the Insurance Code" be accounted for and transmitted to the commissioner. On the same date as this order, and pursuant to its terms, the commissioner sent a letter to all California agents of Rhode Island and to all brokers doing business with that company. Such a letter was

sent to appellants. The letter summarized the terms of the order and called attention to the fact that the order did not terminate Rhode Island's business nor cancel its policies. It directed the agents and brokers not to commit Rhode Island to any further insurance business, to hold all funds or premiums collected or to be collected in their fiduciary capacity in trust pending further instructions, and not to otherwise disburse them. The letter specifically applied these limitations to return premiums due an assured upon cancellation, prohibiting their return to the assured or their use to purchase other insurance.

Cox notified Burke about the conservatorship and also told him that the Rhode Island premium was still in appellants' possession. Thereupon Burke instructed Cox to pay over to respondent the earned premium on the policy, but directed him not to pay over the balance.

The commissioner sent a second form letter to agents and brokers dated June 2, 1949, which letter was also received by appellants. It enclosed and described the vesting order, nominated an agent for transmittals, prohibited, except for a minor exception, further business with Rhode Island, ordered the collection of premiums to be continued, and contained in italics the same provisions and directions as were in the first letter as to the handling of fiduciary funds, with transmittal directions, and specifically warned that return premiums upon cancellation could not be used to purchase other insurance or returned to the assured.

In the meantime, appellants had been attempting to secure insurance to supplant that of Rhode Island. On June 6 or 7, 1949, they secured a commitment from another company. The Rhode Island policy was formally cancelled on June 9th. On June 24th the Edison company received from appellants a credit memorandum for an amount representing the difference between the total premium for the Rhode Island insurance less the amount of the premium earned up to the date of cancellation. The amount of such earned premium was $241.63, which amount was tendered to the conservator by appellants, but refused by him, he having made formal demand on June 1st for the total premium.

On October 10, 1950, the conservator filed a petition which was granted, directing the appellants to show cause why they should not be compelled to pay to the conservator the full amount of the premium involved, that is, $2,380. The petition alleges some of the facts above set forth and specifically avers

that the Edison company paid the premium on May 10, 1949, "to said broker as agent of, and for transmittal to, Rhode Island Insurance Company" and that appellants' firm received this sum "in the capacity of agent for Rhode Island Insurance Company."

Appellants filed objections to the order to show cause, and a supporting affidavit of Cox. These documents set forth the pertinent facts, averring also that except for the amount of the premium earned at the date of cancellation appellants held no money belonging to the conservatorship, and urging that appellants' firm was a broker for the Edison company.

The trial court found the allegations in the conservator's petition to be true and expressly found that on May 10, 1949,* appellants "as agents for Rhode Island Insurance Company" received the premium in question. It found that appellants were indebted to respondent for the full amount of the unearned premium less a broker's commission of $60.25 (thus leaving a balance of $2,319.75). Judgment was entered in that amount.

Appellants vigorously contend that the evidence shows that they were brokers acting for the Edison company, and for it alone, and that there is no evidence to establish that they were the actual or ostensible agents of Rhode Island for any purpose. This contention is almost entirely predicated upon the general definition of "broker" contained in section 33 of the Insurance Code which provides: " 'Insurance broker' means a person who, for compensation and on behalf of another person, transacts insurance other than life with, but not on behalf of, an insurer." It is contended that since this statute expressly provides that a broker transacts business "not on behalf of" the insurer, it operates as a statutory limitation on the broker's functions so as to preclude such broker from acting as the agent for such insurer. It is urged that the fiduciary duties imposed by section 1730 of the Insurance Code are owed only to the assured. That section, prior to the 1951 amendments not here applicable, reads as follows: "All funds received by any . . . broker . . . as premium or return premium on or under any policy are received by such agent, broker or solicitor in his fiduciary capacity. Any agent, broker or solicitor who diverts or appropriates such funds to his own use is guilty of theft and punishable for theft as provided by law."

---

*Erroneously found as May 10, 1947, in the findings.

The appellants contend, without citation of case authority, that these two statutes conclusively establish, as a matter of law, that appellants owed a fiduciary duty only to the Edison company, and hence that appellants could not have been the agent of Rhode Island. Then appellants devote a major portion of their brief to refuting the existence of any ostensible authority of appellants to act for Rhode Island. They argue that there was no negligent or intentional misleading of a third person as to their authority, and no grounds for an estoppel, all elements of an ostensible agency.

The doctrine of ostensible agency is not here applicable. This is a dispute between a claimed principal, Rhode Island, and a claimed agent, appellants. No claim is or can be made that any third person was misled as to the agent's authority. The findings in this case are predicated upon the theory that appellants were the agents in fact for Rhode Island—that is, that they had actual authority to act. The case must rise or fall on the question as to whether the facts support the finding that appellants were the agents of Rhode Island for the purposes of delivering the policy and transmitting the premium.

In our opinion the facts demonstrate that the appellants acted in a dual capacity. As broker, appellants, of course, acted as agent for the Edison company to procure the policy. Although that policy was procured from Rhode Island, in procuring that policy appellants were not the agent of that company. That is what section 33 of the Insurance Code provides. ■ But when the policy was delivered to the broker by Rhode Island for delivery to the Edison company, and when the Edison company delivered to the broker the premium to be delivered to Rhode Island, the broker became agent for the insurer to deliver the policy and to collect the premium. The facts create the agency and fiduciary relationship with the insurer. ■ All that section 33 of the Insurance Code does is to declare that the broker in securing a policy for a client acts only as agent for the assured and not as agent for the insurer. But the section does not declare that if the broker assumes to act for and on behalf of the insurer that an actual agency cannot be created. When the broker accepts the policy from the insurer and the premium from the assured, he has elected to act for the insurer to deliver the policy and to collect the premium.

A provision similar to section 33 of the Insurance Code appears in the law of many states. It has uniformly been

held that such a provision does not prevent an actual agency relationship, different from that described in the section, from arising from the fact of conducting a transaction. These cases all hold or imply that statutes defining "broker" are not determinative of the actual relationship in a particular case. ■ The actual relationship is determined by what the parties do and say, not by the name they are called. (*Midwest Transfer Co.* v. *Preferred Acc. Ins. Co.*, 342 Ill. App. 231 [96 N.E.2d 228]; *Wood* v. *Firemen's Fire Ins. Co.*, 126 Mass. 316; *John R. Davis Lbr. Co.* v. *Hartford Fire Ins. Co.*, 95 Wis. 226 [70 N.W. 84, 37 L.R.A. 131]; *Transcontinental Oil Co.* v. *Atlas Assur. Co.*, 278 Pa. 558 [123 A. 497].)

Thus the real question is whether or not, when the broker is intrusted with and accepts the policy from the insurer for delivery to the assured, and accepts the premium from the assured for delivery to the insurer, such facts create an actual agency.

The English and American cases are uniform in holding that in such cases the broker acts as agent for the insurer. Appellants recognize the existence of such authorities but contend that all of the cases involved an ostensible agency or agency by estoppel. This contention is far too broad. As already pointed out, when the controversy arises between the insurer, as principal, and the broker as agent, the doctrine of ostensible agency has no application. Such cases can be explained only on the theory of actual agency.

There are several English authorities that involve such controversies between the insurer on one side and the broker on the other. They uniformly hold that an agency relation exists to collect the premium. Thus in *Minett* v. *Forrester* (1811), 128 Eng.Rep. 441, 443, it is stated: "The broker is agent for the assured, and also for the underwriter [insurer]; he is agent for the insured, first, in effecting the policy, and in every thing that is to be done in consequence of it; then he is agent for the underwriter as to the premium, but for nothing else; and he is supposed to receive the premium from the insured for the benefit of the underwriter." (See, also, *Shee* v. *Clarkson*, (1810), 104 Eng.Rep. 199; *Goldschmidt* v. *Lyon*, (1812), 128 Eng.Rep. 438; *Houstoun* v. *Robertson* (1816), 128 Eng.Rep. 1109.)

The American cases involving the broker-insurer relationship are also uniform in holding that in remitting the premium the broker acts for and owes a fiduciary relationship to

the insurer. This is also the rule of the Restatement of Agency. Section 71 provides: "Unless otherwise agreed, authority to receive payment is inferred from authority to conduct a transaction if the receipt of payment is incidental to such a transaction, usually accompanies it, or is a reasonably necessary means for accomplishing it."

The "authority to conduct a transaction" referred to in this section is to be found in the fact that the broker was intrusted with possession of the policy for delivery. The California cases have adopted the rule stated in the restatement (*California Stearns Co.* v. *Treadwell*, 82 Cal.App. 553 [256 P. 242]; *Schomaker* v. *Petersen*, 103 Cal.App. 558 [285 P. 342]) and it is generally codified in section 2319 of the Civil Code.

One of the typical American cases is *Pearl Assur. Co.* v. *National Ins. Agency*, 151 Pa.Super. 146 [30 A.2d 333] (see, also, 150 Pa.Super. 265 [28 A.2d 334]). There it was held that the premium collected by the broker from the assured belonged to and was the property of the insurer, being merely intrusted to the broker as agent for the insurer. The court stated (30 A.2d at p. 335): "There is nothing inherently inconsistent between the position of an insurance broker in the placing of policies and his acting for the insurance company in collecting the premiums and remitting the proceeds after deducting his commissions." This result was reached although Pennsylvania has a statute similar to section 33 of the Insurance Code. Such a section, said the court, does not prevent a broker from acting as agent of the insurer in the collection and paying over of the premium, because having accepted the responsibility from the insurer to deliver the policy and to collect the premium, the broker owes the insurer a fiduciary duty to remit.

In *Stevens* v. *Rasin Fertilizer Co.*, 87 Md. 679 [41 A. 116, 117], appears the following: "We have said that the broker in the city of Baltimore who obtained the insurance was the agent of the defendant. But he performed other services in addition to obtaining the consent of the insurance company to its part of the contract. He was intrusted with the possession of the policies for the purpose of delivering them to the defendant, provided it would pay the cash premiums; and he was also intrusted with the collection and transmission of the money. For these services he was paid by the insurance company, and therein he was its agent. He was paid by being allowed to retain a commission out of

the premiums received from the defendant. . . . The insurance company surely was not paying the defendant's agent for collecting from the defendant money, and transmitting it to itself at Boston." (See, also, *Sun Ins. Office, Ltd., of London* v. *Mallick,* 160 Md. 71 [153 A. 35].)

Two New York cases not only hold that the broker is agent of the insurer to remit the premiums, but also hold that the premiums are "trust funds." (*Leterman* v. *Pink,* 249 App. Div. 164 [291 N.Y.S. 249], aff. in 275 N.Y. 613 [11 N.E. 2d 781]; *In re Sommer's Estate,* 12 N.Y.S.2d 47.)

The problem is accurately discussed in 16 Appleman, Insurance Law and Practice, starting at page 151. At page 164 the author summarizes his conclusions as to the law of the United States as follows: "So far as services are rendered to the insurer, the act of a broker becomes the act of the company. If the broker is entrusted with the delivery of the policy and collection of premiums, many cases hold that he acts in these respects as the agent of the insurer. This result is not prevented by the division of representatives of insurance companies by an insurance code into agents and brokers."

Appellants are correct in stating that some of the other cases cited by respondent, although some utilize language of actual agency, can be explained on an agency by estoppel theory, but the English cases cited and the American authorities above referred to can only be explained upon the theory of an actual agency. Thus it must be held that in the instant case appellants were the agent of Rhode Island to deliver the policy and to collect the premium. Therefore, when the premium was delivered to appellants they owed a fiduciary duty to Rhode Island to transmit it and were the agents of Rhode Island for that purpose.

The only other contention made by appellants is that the trial court lacked jurisdiction of this controversy. In their objections to the order to show cause the appellants pleaded: "That this Court has no jurisdiction to enter the order as prayed for, or at all, for the reason that . . . [appellants] have not now at all in their possession or under their control any property or funds belonging to said conservatorship."

Just what this allegation is intended to mean and what jurisdictional defect is thus sought to be raised is not entirely clear. Appellants argued several jurisdictional theories in their opening brief. Respondent answered these ar-

guments, raised several arguments to support the trial court's jurisdiction, and cited a statute which apparently confers jurisdiction on the trial court. The appellants not only failed to answer these arguments, but, in fact, do not even mention the jurisdictional question in their reply brief.

So far as jurisdiction generally is concerned, there can be no doubt that the conservatorship court had such jurisdiction. Appellants seem to argue that prior to 1935, when the insurance law was codified, the law was that a receivership court had no jurisdiction of such a controversy, that the conservatorship court has the same jurisdiction as a receivership court, and that this rule was not changed by the codification of 1935. In this connection appellants place their greatest reliance on the case of *Anderson* v. *Great Republic L. Ins. Co.*, 41 Cal.App.2d 181 [106 P.2d 75]. That case held that the conservatorship court has the same equitable discretionary jurisdiction as a receivership court over an award of attorney's fees, that it was required to exercise its discretion by fixing such fees, and could not avoid this responsibility by relegating the claimant to an independent action at law. In the course of its discussion of this point the court noted that the insurance law had been codified in 1935, and stated, by way of dicta, that, as far as the conservatorship court's equity powers are concerned, the new law, since 1935, is not broader than the old law. This statement is much too broad.

When the insurance law was codified in 1935, so far as the jurisdiction of the conservatorship court is concerned, the original enactment did purport to state existing law. Article 14 of the codification relates to "Proceedings Against Insolvent Insurers." As originally adopted in 1935 section 1047 of the Insurance Code, part of Article 14, provided: "Except as otherwise provided by law, in all cases arising under this article the powers and duties of the commissioner with relation to the assets and business of any insurer placed under his control shall be those exercised by and imposed upon receivers of corporations within this State on July 22, 1919." (Stats. 1935 at p. 556—printed in small print to indicate that it was superseded by a later statute passed at the same session.) Later in the 1935 session article 14 was completely revised and section 1047 became section 1058. As then revised the section provided: "In any proceeding pending under the provisions of this article, the court in which such proceeding is pending shall have jurisdiction to summarily hear and determine, in such proceeding, all actions

or proceedings then pending or thereafter instituted by or against the person affected by a proceeding under this article.'' (Stats. 1935 at p. 552.) Since then the section has been amended but once—in 1939. In that year, as one of a series of language amendments, section 1058 was amended so as to delete the split infinitive by changing the phrase ''to summarily hear and determine'' to read ''to hear and determine.'' (Stats. 1939 at p. 2634.)

Thus, by statute, the conservatorship court is expressly given jurisdiction to hear and determine controversies such as the one here involved. Prior to 1935 the conservatorship court had no express statutory authority over such controversies. Thus the basic premise of appellants' argument, based upon the dicta in the Anderson case, namely, that as to the powers of the conservatorship court there is no difference between the pre-1935 and post-1935 insurance law, is clearly unsound. All the court held in the Anderson case was that as to the subject under inquiry—equitable discretion over attorney's fees—pre- and post-1935 law was identical.

Thus we must start with the premise that since 1935, by express statutory provision, the conservatorship court has general jurisdiction over even third parties to determine questions relating to the claims of the insolvent insurance company which has been taken over by the insurance commissioner.

But that does not entirely determine the issue here presented. In addition to jurisdiction of the conservatorship court over this controversy, which undoubtedly existed, it must be determined whether the commissioner as conservator utilized the correct procedure to enforce his claim. Was he justified in using the summary procedure of an order to show cause, or should he have brought a separate equitable action in the conservatorship proceeding to enforce his claim against appellants? That is an interesting question. If appellants were third persons claiming an independent title to the property, then some difficult questions might be presented. There is a substantial body of law to the effect that a receivership court does not have jurisdiction to bring into a pending receivership proceeding by a mere order to show cause persons who are not parties to the receivership and who assert an independent claim of ownership to assets in their possession. (*Stuparich Mfg. Co.* v. *Superior Court,* 123 Cal. 290 [55 P. 985] ; *Miller* v. *Superior Court,* 63 Cal.App. 1 [217 P. 817] ; *First Nat. H. T. Ltd.* v. *Superior Court,*

88 Cal.App. 292 [263 P. 343]; *Tapscott* v. *Lyon,* 103 Cal. 297 [37 P. 225].)

Appellants apparently seek to invoke this rule, contending that they, as holders of the premium, are, in legal effect, asserting the title of the Edison company to the fund, and that, in fact, the Edison company, as the real claimant, should have been made a party in the court below. ■ The point as to nonjoinder, where, as here, it was not made in the trial court, cannot be raised for the first time on appeal.

■ The contention here involved is predicated on the false premise that appellants hold a fund, the title to which is in dispute. This is based on a misconception of the facts. The appellants received the premium on May 10, 1949. It has already been held that they received this premium as agent for Rhode Island. From and after that date they owed to Rhode Island a fiduciary duty to remit the premium. The premium belonged to Rhode Island and appellants held it in trust for that company. On May 17th, and again on June 2, 1949, appellants were informed that the respondent claimed this fund as conservator of Rhode Island. The appellants, however, did not perform their fiduciary duty. In direct violation of the orders of their principal, the respondent, on June 24, 1949, the appellants sent to the Edison company a credit memorandum for the full amount of the unearned premium. In accordance with the business practices of the parties this was tantamount to payment of the unearned premium to the Edison company. (See affidavit of Cox in support of opposition to the order to show cause, particularly at Cl. Tr. p. 19.) Thus the factual situation is not, as claimed by appellants, one where appellants are holding a fund which is in dispute between respondent and the Edison company, the latter being a third party to the conservatorship proceeding, but one where the agent of Rhode Island, with full knowledge of the conservatorship proceeding and of the claims of respondent, has, in violation of its fiduciary duty, paid the money over to the Edison company. The respondent is not seeking to follow the trust fund into the hands of the Edison company, but to hold the appellants liable for breach of their fiduciary duty owed to Rhode Island. The findings, conclusions and judgment do not award a "fund" to respondent. They simply determine that appellants "are indebted" to respondent in a fixed sum, and judgment is entered in that sum. The rights between the Edison company and appellants are not here involved. Undoubtedly the con-

servatorship court has no power to determine those rights. But it has power over Rhode Island and its agents to determine controversies between Rhode Island and its agents.

This premium when paid to appellants was the property of Rhode Island. It was an asset of Rhode Island. It was, through the medium of appellants' agency, constructively in the possession of Rhode Island. ██ It is elementary that, even a receivership court, has power to proceed summarily to recover assets already constructively within the receiver's possession, or to hold an agent for failure to remit such asset.

As pointed out by Clark on Receivers (p. 798):

"As to third persons and neither officers of the court, nor parties to the suit, possession or custody by the court seems to be the determining factor as to whether a summary or plenary suit must be brought. Possession need not be physical possession but may be and sometimes is constructive possession. If the court has such possession then the court can protect its possession by summary process even against their persons.

"Where there is no possession by the receiver but merely a claim or right which belonged to the defendant previous to receivership proceedings and the receiver claims possession against a third party and such third party's claim is a mere pretense or merely colorable, then the receiver will be given the aid of the court of equity in securing such possession by summary process."

This rule is here applicable. The appellants are not independent third party claimants to the unearned premium. ██ They held that premium as agent for Rhode Island and were under a duty to remit it. The fund was constructively the property of Rhode Island. The appellants violated that duty by paying the amount of the unearned premium to the Edison company. The conservatorship court has jurisdiction to hold the agent liable, in a summary proceeding, for disposing of this asset.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.